UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| | | | |
|---|---|---|---|
| Case No. | **EDCV 26-1621 JGB (ACCVx)** | Date | June 25, 2026 |
| Title | *Cesear A. Sanchez v. Stremicks Heritage Foods, LLC, et al.* | | |

Present: The Honorable    JESUS G. BERNAL, UNITED STATES DISTRICT JUDGE

| MAYNOR GALVEZ | Not Reported |
|---|---|
| Deputy Clerk | Court Reporter |

| Attorney(s) Present for Plaintiff(s): | Attorney(s) Present for Defendant(s): |
|---|---|
| None Present | None Present |

**Proceedings:** Order (1) DENYING Plaintiff's Motion for Remand (Dkt. No. 17); and (2) VACATING the June 29, 2026, Hearing (IN CHAMBERS)

Before the Court is a Motion for Remand filed by Plaintiff Cesar A. Sanchez. ("Motion," Dkt. No. 17.) The Court finds the Motion appropriate for resolution without a hearing. See Fed. R. Civ. P. 78; L.R. 7-15. After considering the papers filed in support of and in opposition to the Motion, the Court **DENIES** the Motion. The Court **VACATES** the hearing set for June 29, 2026.

## I. BACKGROUND

On December 11, 2025, Plaintiff Cesar A. Sanchez ("Plaintiff") filed a complaint in the Superior Court of California for the County of Riverside against Defendant Stremicks Heritage Foods, LLC ("Stremicks" or "Defendant") and Does 1-10. ("Complaint," Dkt. No. 1-1.) On February 6, 2026, Plaintiff filed a First Amended Complaint ("FAC," Dkt. No. 1-2.) The FAC alleges nine causes of action: (1) failure to pay minimum wages in violation of California Labor Code ("CLC") §§ 204, 1194, 1194.2, and 1197; (2) failure to pay overtime compensation in violation of CLC §§ 1194 and 1198; (3) failure to provide meal periods in violation of CLC §§ 226.7 and 512; (4) failure to authorize and permit rest breaks in violation of CLC § 226.7; (5) failure to indemnify necessary business expenses in violation of CLC § 2802; (6) failure to timely pay final wages at termination in violation of CLC §§ 201-203; (7) failure to provide accurate itemized wage statements in violation of CLC § 226; (8) unfair business practices in violation of CLC §§ 17200, et seq.; and (9) civil penalties under the Private Attorneys General Act, CLC §§ 2699, et seq. (See id.)

On April 2, 2026, Defendant removed the action to this Court. ("Notice of Removal," Dkt. No. 1.) On May 14, 2026, Plaintiff filed the instant Motion. (Mot.) Defendant opposed the Motion on May 22, 2026. ("Opposition," Dkt. No. 21.) Plaintiff replied in support of the Motion on June 1, 2026. ("Reply," Dkt. No. 25.)

## II.    LEGAL STANDARD

"CAFA gives federal district courts original jurisdiction over class actions in which the class members number at least 100, at least one plaintiff is diverse in citizenship from any defendant, and the aggregate amount in controversy exceeds $5 million, exclusive of interests and costs." Ibarra v. Manheim Investments, Inc., 775 F.3d 1193, 1195 (9th Cir. 2015). "In determining the amount in controversy, courts first look to the complaint. Generally, the sum claimed by the plaintiff controls if the claim is apparently made in good faith." Id. at 1197 (quotations omitted). "Whether damages are unstated in a complaint, or, in the defendant's view are understated, the defendant seeking removal bears the burden to show by a preponderance of the evidence that the aggregate amount in controversy exceeds $5 million when federal jurisdiction is challenged." Id.

Where a plaintiff makes a factual attack in the context of CAFA jurisdictional requirements, defendants are required to support their jurisdictional allegations with proof typically considered at summary judgment. A factual attack "contests the truth of the . . . allegations" themselves. Id. (citation omitted). "When a plaintiff mounts a factual attack, the burden is on the defendant to show, by a preponderance of the evidence, that the amount in controversy exceeds the $5 million jurisdictional threshold." Id. (quoting Ibarra, 775 F.3d at 1197). A factual attack "need only challenge the truth of the defendant's jurisdictional allegations by making a reasoned argument as to why any assumptions on which they are based are not supported by evidence." Harris v. KM Indus., Inc., 980 F.3d 694, 700 (9th Cir. 2020) (citing Ibarra, 775 F.3 at 1199 (finding that it is sufficient to "contest [an] assumption" without "assert[ing] an alternative [assumption] grounded in real evidence")).

A defendant is required to file a notice of removal that includes only "a plausible allegation that the amount in controversy exceeds the jurisdictional threshold." Dart Cherokee Basin Operating Co. v. Owens, 574 U.S. 81, 88 (2014). But if a plaintiff contests these allegations, "both sides submit proof and the court decides, by a preponderance of the evidence, whether the amount-in-controversy requirement has been satisfied." Id. The preponderance of the evidence standard requires that "the defendant must provide evidence establishing that it is more likely than not that the amount in controversy exceeds that amount." Sanchez v. Monumental Life. Ins. Co., 102 F.3d 398, 404 (9th Cir. 1996) (internal quotations omitted). The parties "may submit evidence outside the complaint, including affidavits or declarations, or other summary-judgment-type evidence relevant to the amount in controversy at the time of the removal." Ibarra, 775 F.3d at 1197 (internal quotations and citation omitted). "[A] defendant cannot establish removal jurisdiction by mere speculation and conjecture, with unreasonable assumptions." Id.

"CAFA's requirements are to be tested by consideration of real evidence and the reality of what is at stake in the litigation, using reasonable assumptions underlying the defendant's theory of damages exposure."  Id. at 1198.  "As with other important areas of our law, evidence may be direct or circumstantial.  In either event, a damages assessment may require a chain of reasoning that includes assumptions. When that is so, those assumptions cannot be pulled from thin air but need some reasonable ground underlying them."  Id. at 1199.  "Under the preponderance of the evidence standard, if the evidence submitted by both sides is balanced, in equipoise, the scales tip against federal-court jurisdiction."  Id.

## III.  DISCUSSION

Plaintiff raises three arguments: (1) that Defendant's removal does not satisfy minimal diversity under CAFA, (2) that Defendant's amount-in-controversy calculations rest on an unestablished evidentiary foundation; and (3) that Defendant's amount-in-controversy calculations fail to meet the jurisdictional threshold.  (Mot. at 11-28.)

### A.  Minimal Diversity

First, Plaintiff and Defendant dispute the standard for determining minimal diversity as applied to limited liability companies ("LLC") in CAFA cases.  Plaintiff argues that an LLC is considered an "unincorporated association" under 28 U.S.C. § 1332(d)(10) ("Section 1332(d)(10)"), and thus Defendant's citizenship is determined by the location of the LLC's "principal place of business and the State under whose laws it is organized."  (Mot. at 12-15.) Defendant counters that general diversity principles apply and points to Johnson v. Columbia Properties Anchorage, LP for the position that an "LLC is a citizen of every state of which its owners/members are citizens."  437 F.3d 894, 899 (9th Cir. 2006).  (Opp'n at 10-11.)  Using the members test, Defendant contends that Stremicks is a citizen of Delaware and Kansas because its sole member, Dairy Farmers of America ("DFA") is a citizen of those states.  (Opp'n at 9-10.)

While Defendant appears to be correct about the Ninth Circuit's position on LLC citizenship in normal diversity inquiries, Johnson does not control the outcome in this case because it did not analyze the specific language in CAFA for diversity inquiries.  In fact, the very reasoning upon which the Ninth Circuit relied in finding that LLCs are normally evaluated under the members test supports the conclusion that they should be treated as unincorporated entities for CAFA purposes.  In a non-CAFA diversity inquiry, a partnership—as opposed to a corporation—takes on the citizenship of all its members.  See Johnson, 437 F.3d at 899.  Johnson went on to explain that while "LLCs resemble both partnerships and corporations," circuit courts "treat[] them like partnerships for the purposes of diversity jurisdiction."  Id.  The essential takeaway from Johnson as it relates to this case is that LLCs should be treated like partnerships for diversity purposes, which means that they should be considered unincorporated entities when it comes to a diversity analysis.  While in Johnson that yielded the result that the members test was appropriate, CAFA dictates the opposite approach.

---

**CIVIL MINUTES—GENERAL**    Initials of Deputy Clerk MG

Under CAFA, unincorporated associations are to be evaluated under the principal place of business test.  See Section 1332(d)(10); see also Ferrell v. Express Check Advance of SC LLC, 591 F.3d 698, 705 (4th Cir. 2010).  Because the important instruction in Johnson is that LLCs should be treated like partnerships for a diversity analysis, the Court determines that the principal place of business test is the proper standard for analyzing Defendant's citizenship in this CAFA case, consistent with Johnson and myriad other district courts in this circuit.  See, e.g., Ramirez v. Carefusion Resources, LLC, 2019 WL 2897902 at *2-3 (S.D. Cal. Jul. 5, 2019); Marroquin v. Wells Fargo LLC, 2011 WL 476540 at *2 (S.D. Cal. Feb. 3, 2011); Jack v. Ring, LLC, 2021 WL 3510291, at *714-16 (N.D. Cal. Aug. 10, 2021); Cushman v. Physical Rehab. Network, LLC, 2024 WL 3086137, at *3 (S.D. Cal. June 20, 2024); and Rubalcaba v. R&L Carriers Shared Servs., L.L.C., 2024 WL 1772863, at *2 (N.D. Cal. Apr. 23, 2024).

A company's "principal place of business" is determined by the "nerve center" test: the place where the company's officers direct, control, and coordinate the company's activities. Hertz Corp. v. Friend, 559 U.S. 77, 92-93 (2010).  Under this approach, Plaintiff contends that Defendant is a citizen of Delaware, where it is organized, and California, because Defendant's Statement of Information filed with the California Secretary of State lists a California address as its "Principal Office." (Mot. at 13, 15.)

Defendant is undisputedly organized in Delaware.  (Id. at 13; Opp'n at 12.)  Plaintiff and Defendant, however, disagree about the location of Stremicks's principal place of business ("PPB").  Plaintiff argues that Stremicks's PPB is in California, thereby destroying diversity. (Mot. at 17.)  Defendant argues that Stremicks's PPB is in Kansas.  (Opp'n at 10.)  Plaintiff contends that California is Stremicks's PPB because the company's registration with the California Secretary of State lists an address in Santa Ana as the "principal office" and "principal executive office."  (Mot. at 15-16.)  But Hertz explicitly rejects the suggestion that a "mere filing of a form . . . listing a corporation's 'principal executive offices' would, without more, be sufficient proof to establish a corporation's 'nerve center.'"  559 U.S. at 96.  Here, Defendant clarifies that the Santa Ana address is primarily a production plant, and not a corporate office.  (Declaration of Jack Haak ("Haak Declaration"), Dkt. No. 21-2 ¶ 5.)  This undermines the suggestion that the registered address meaningfully indicates Stremicks's "nerve center" is at the Santa Ana address.

Plaintiff raises several inconsistencies in Defendant's description of its citizenship to reject the contention that Stremicks is a citizen of Kansas.  (Reply at 3; Haak Decl.)  First, Haak lists Pat Panko as DFA's Chief Commercial Officer ("CCO"), whereas Stremicks's Statement of Information field with the Secretary of State lists Panko as the Chief Executive Officer of Stremicks ("CEO").  (Reply at 3; Haak Decl. ¶ 7.)  Regardless of Panko's precise title at Stremicks, Panko is one of four Stremicks executive officers located in Kansas and has resided there since 2019.  (Haak Decl. ¶¶ 6-7.)  The Hertz test is ultimately concerned with a business's "actual center of direction, control, and coordination."  559 U.S. at 93.  Whether Panko is Stremicks's CEO or CCO, he and the other officers responsible for the direction, management, control, and coordination of Stremicks perform that work in Kansas. (Haak Decl. ¶¶ 6-8.)

---

**CIVIL MINUTES—GENERAL**                    Initials of Deputy Clerk MG

Plaintiff also discusses how Haak establishes that Stremicks's President, Sam Stremick, resides in California and manages activities from California. (Reply at 3-4; Haak Decl. ¶ 6.) Haak goes on to indicate, however, that while Sam Stremick is President, he serves as a "local manager" and "reports directly to the Chief Commercial Officer Pat Panko." (Haak Decl. ¶ 6.) The presence of a single executive officer in California who locally manages a production facility and reports to leadership in Kansas does not establish California as the location where Stremicks's officers "direct, control, and coordinate" the company's activities. While there are minor discrepancies in the Haak Declaration, none undermine the relevant facts indicating that Stremicks's nerve center is in Kansas. This creates minimal diversity for CAFA purposes.

Plaintiff further argues that a "parent's coordination of a subsidiary does not, without more, make the parent's headquarters the subsidiary's nerve center; if the law were otherwise, every wholly owned subsidiary in the country would share its parent's citizenship as a matter of course, contrary to settled doctrine." (Reply. at 6.) But the Court does not base its finding of minimal diversity on DFA's residence as a sole member of Stremicks or on DFA's mere "coordination" of Stremicks. Instead, the Court relies on the fact that the bulk of Stremicks's actual management personnel, who it shares with DFA, and which includes its CCO, CEO, CPO, and CFO, reside and operate in Kansas. (Id.) Defendant's citizenship is therefore properly considered as being in Delaware and Kansas.

## B.  Amount In Controversy

Because there is minimal diversity, the Court next considers the amount in controversy. Plaintiff argues that Defendant fails to establish that the amount in controversy exceeds $5 million as required for diversity jurisdiction under CAFA. (Mot. at 1.) The Court disagrees.

### 1.  Defendant's Meal and Rest Break Violation Calculations are Reasonable

Plaintiff contends that Defendant's violation rate of 20% in its calculation of meal and rest break violations is "overstated relative to the Complaint's language," and instead proposes the Court use a 15% violation rate to calculate the amount in controversy. (Mot. at 21-22.) Plaintiff's FAC alleges that meal and rest break violations occurred "sometimes, but not always." (FAC ¶ 17.) The FAC also alleges that Defendant had a "policy and practice of" of labor law violations and that Defendants "regularly failed to provide Plaintiff . . . with both meal periods." (Id. ¶¶ 5, 15-17, 51.) The allegation that violations occurred "sometimes, but not always," lacks specificity and Plaintiff's arguments do not establish that Defendant's proposed violation rate are unsupported or inconsistent with the pleadings. Moreover, Plaintiff's proffered justification for a 15% violation rate rather than a 20% violation rate is not persuasive based on the FAC's non-specific language.

Defendant's assumptions and calculations regarding Plaintiff's meal and rest break claims are reasonable and establish, by a preponderance of the evidence, at least $1,687,360 and $1,729,870 in controversy for meal-period and rest-break violations, respectively. Defendant calculated its meal-period amount in controversy by assuming a 20% meal break violation rate

---

**CIVIL MINUTES—GENERAL**              Initials of Deputy Clerk MG

across the 289,328 meal-break eligible shifts (resulting in 57,865 violation days), based on the putative class members' average base hourly rate of at least $29.16 ($29.16 per hour X one hour premium pay X 289,328 days X 20%).  (Notice of Removal ¶ 34.)  Defendant calculated its rest-break amount in controversy by assuming a 20% rest-break violation rate across the 296,617 rest-break-eligible workdays (resulting in 59,323 violation days), based on the putative class members' average base hourly rate of at least $29.16 ($29.16 per hour X one hour of premium pay X 296,617 days X 20%).  (Id. ¶ 40)  Together, the meal and rest break calculations total $3,417,230.

### 2. Defendant's Waiting Time Penalty Calculations are Reasonable

With respect to waiting time penalty calculations, the FAC alleges that "Plaintiff, the Class, and Aggrieved Employees are entitled to recover from Defendants their additionally accruing wages for each day they were not paid, at their regular hourly rate of pay, up to 30 days maximum pursuant to California Labor Code § 203."  (FAC ¶ 66.)  Plaintiff prefers that the Court calculate the amount in controversy for this claim based on a 15-day waiting period.  (Mot. at 23.)  But because Plaintiff expressly seeks recovery up to the statutory maximum penalty, it is reasonable for Defendant, and the Court, to assume that Plaintiff and the putative class members may recover waiting-time penalties for up to 30 days.  See Jauregui v. Roadrunner Transportation Services, Inc., 28 F.4th 989, 993-94 (9th Cir. 2022) (holding that it was reasonable to assume employees were entitled to the maximum 30-day waiting-time penalty where the alleged violations spanned four years, and that the possibility that a small percentage of employees might not qualify for the full penalty did not undermine the defendant's amount-in-controversy estimate).

In addition, the FAC alleges that "during the relevant time period, Defendants failed, **and continue to fail**, to pay terminated Class Members, without abatement, all wages required to be paid by California Labor Code sections 201 and 202 either at the time of discharge, or within seventy-two (72) hours of their leaving Defendants' employ." (FAC ¶ 63 (emphasis added).)  Given Plaintiff's allegation that these violations continue to the present day, it is likewise reasonable for Defendant to assume that the maximum 30-day penalty applies.  See Kastler v. Oh My Green, Inc., 2019 WL 5536198, at *16 (N.D. Cal., Oct. 1, 2019) ("Because Plaintiff alleges that Defendant failed to pay overtime and minimum wage and meal and rest break premiums to present employees, using the thirty-day maximum is inherently reasonable.").  As this Court recently observed in Hill v. Hogan Pers., LLC, "for a putative class member to recover 30 days' worth of his or her salary, the injury need only have lasted for more than 30 days—which is necessarily true if, as Plaintiff alleges, the Labor Code violations remain ongoing." 2025 WL 1898255, at *8 (C.D. Cal. July 9, 2025).  Plaintiff's proposed 15-day limitation finds no support in the FAC and is inconsistent with the allegation that Defendant's failure to pay wages remains ongoing.

Defendant calculated the waiting time penalties amount in controversy by assuming the maximum 30-day penalty period for each of the 145 putative class members at an average rate of 8.80 hours per day and $28.00 per hour (30 X 8.80 X $28.00 X 145).  (Notice of Removal ¶ 45.)  That amounts to $1,071,840.  (Id.)

---

### 3. Defendant's Wage Statement Violations Calculations are Reasonable

Plaintiff argues that a 33% violation rate for wage statement violations is more appropriate than Defendant's proffered 100% violation rate. (Mot. at 25.) Plaintiff's preferred rate would amount to $331,100 in controversy, compared with Defendant's contention of $994,250 in controversy. (Mot. at 25; Notice of Removal ¶ 49.) As Defendant points out, Plaintiff alleges that Defendant's wage statements failed to include Defendant's address. (FAC ¶ 20.) Plaintiff's allegations offer no limiting language indicating that this, among other, alleged wage statement violation occurred less than 100% of the time. (See FAC.) Plaintiff's suggested 33% violation rate is not based on a concrete contention that the wage statements varied in terms of inclusion of the address during the period covered by the FAC. Defendant's 100% violation rate estimate is therefore reasonable.

The amount in controversy between meal break violations, rest break violations, waiting time penalties, and wage statement penalties together exceeds the $5,000,000 threshold, thereby satisfying CAFA jurisdiction. Because the Court finds that there is minimal diversity and a sufficient amount in controversy, Plaintiff's Motion is **DENIED**.

## IV.    CONCLUSION

For the foregoing reasons, the Court **DENIES** Plaintiff's Motion. The June 29, 2026, hearing is **VACATED**.

**IT IS SO ORDERED.**